UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

_____

In re:

BARRID BERNARD GREEN, JR.,

     Debtor.

_____/

STATE OF MICHIGAN, DEPT. OF LICENSING &
REGULATORY AFFAIRS, UNEMPLOYMENT
INSURANCE AGENCY,

     Plaintiff,

v.

BARRID BERNARD GREEN, JR.,

     Defendant.

_____/

Case No: BG 14-02752
Chapter 7

Adversary Proceeding
No. 14-80184

## OPINION REGARDING NONDISCHARGEABILITY OF DEBT FOR OVERPAID UNEMPLOYMENT BENEFITS, PENALTIES, AND INTEREST

Appearances:

Michael O. King, Jr., Esq., Lansing, Michigan, attorney for State of Michigan, Dept. of
    Licensing & Regulatory Affairs, Unemployment Insurance Agency, Plaintiff.

Garrett J. Tenhave-Chapman, Esq., Grand Rapids, Michigan, attorney for Barrid Bernard
    Green, Jr., Debtor-Defendant.


I.       INTRODUCTION AND ISSUES PRESENTED.

In this adversary proceeding, the State of Michigan, Department of Licensing &

Regulatory Affairs, Unemployment Insurance Agency (referred to herein as "Plaintiff,"

"UIA" or the "Agency") seeks a determination that debts for unemployment benefit

overpayments, penalties, and statutory interest owed by Barrid Bernard Green, Jr. (the "Debtor" or "Defendant") are nondischargeable under § 523(a)(2)(A) and § 523(a)(7) of the Bankruptcy Code.[1]   The overpayments at issue occurred over the course of approximately two years and resulted from the Debtor's failure to report his part-time employment and wages from the City of Grand Rapids when he certified his eligibility for unemployment benefits with the Agency.  After the overpayments were discovered, the Agency issued an administrative Redetermination finding that the Debtor owed $7,984.00 in restitution for the overpayments and imposing $31,416.00 in statutory penalties under § 54(b) of the Michigan Employment Security Act, Mich. Comp. Laws § 421.54(b).

The UIA now seeks a determination that these debts are nondischargeable in the Debtor's chapter 7 case.  Specifically, the Agency asserts that the Debtor's failure to accurately report his part-time earnings constitutes intentional fraud and renders the debts resulting from the overpayments nondischargeable under § 523(a)(2)(A).  The Agency argues that the elements of its § 523(a)(2)(A) claim were established both by the evidence presented at trial and by the factual findings in its prior administrative Redetermination, which was not appealed by the Debtor and which the UIA argues is entitled to preclusive effect in this adversary proceeding.  The Agency also seeks a determination that the statutory penalties assessed against the Debtor are nondischargeable under § 523(a)(7).

For the reasons that follow, the court finds that the Debtor obtained the benefit overpayments by intentionally and fraudulently misrepresenting his employment and

---

[1]     The Bankruptcy Code is set forth in 11 U.S.C. §§ 101-1532 inclusive.  Specific provisions of the Bankruptcy Code are referred to in this opinion as "§ ___."

earnings to the Agency.  Accordingly, the debts owed by the Debtor to the Agency for restitution and statutory interest are nondischargeable under § 523(a)(2)(A).  The court further finds that the debt for statutory penalties is payable to the Agency, as a governmental entity, and is not compensation for pecuniary loss.  Therefore, the debt for penalties is nondischargeable under § 523(a)(7).

## II.      JURISDICTION.

The court has jurisdiction over this bankruptcy case.  28 U.S.C. § 1334.  The bankruptcy case and all related proceedings have been referred to this court for decision. 28 U.S.C. § 157(a); L. Civ. R. 83.2(a) (W.D. Mich.).  This nondischargeable debt action is a statutory core proceeding and this court has constitutional authority to enter a final order.   28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of certain debts); see, e.g., Hart v. Southern Heritage Bank (In re Hart), 564 F. App'x 773, 776 (6th Cir. Apr. 28, 2014) (unpublished opinion) (notwithstanding the Supreme Court's decision in Stern v. Marshall, 564 U.S. 462, 131 S. Ct. 2594 (2011), the bankruptcy court has "constitutional authority to enter a final money judgment in a dischargeability action"). Further, even Stern claims may be decided by bankruptcy courts if the parties consent. Wellness Int'l Network, Ltd. v. Sharif, __ U.S. __, 135 S. Ct. 1932 (2015).  While this is not a Stern claim, the parties have consented to this court entering a final order in this adversary proceeding.  See Report of Parties' Rule 26(f) Conference, AP Dkt. No. 13 at ¶ 3(f)(2); Plaintiff's Consent to Entry of Final Order, AP Dkt. No. 9.

III.   FINDINGS OF FACT.

At the trial held in this adversary proceeding on March 9, 2016, the court heard testimony from the Debtor and three witnesses called by the UIA:  Katherine Potter, an unemployment insurance examiner with the Agency; Shemin Adat-Blundell, manager of the Benefit Payment Control Unit and Fraud Enforcement Unit at the Agency; and Marianne Peterson, an employee of the City of Grand Rapids Parks and Recreation Department who processes payroll.  All of the Agency's witnesses testified credibly.  The Debtor also testified credibly, although his testimony concerning whether he intentionally misled the UIA strained credulity, for the reasons set forth herein.  The court also admitted ten exhibits into evidence.  The testimony and exhibits provided information about the general policies and procedures utilized by the Agency, as well as the specific facts pertaining to the Debtor's application for benefits and the Agency's ultimate determination that he was overpaid.

The Debtor first applied for the unemployment benefits at issue in this adversary proceeding on January 19, 2010.  (Plf. Exh. 1.)  The initial application, which was completed and signed by the Debtor, lists the City of Grand Rapids as the Debtor's most recent employer.  (Id.)  It indicates that the Debtor began work for the City in September 2008 and lists the "Last Day Worked" as "present."  (Id.)  The Debtor lists "lack of work" as the reason for separation from this job.  (Id.)  The application also discloses Mac's Convenience Stores as the Debtor's next most recent employer.  (Id.)  When asked to explain his reason for separation from this job as a store clerk, the Debtor states that he "got fired for being out of uniform."  (Id.)  The application states that the Debtor's last day of employment at Mac's Convenience Store was January 15, 2010.  (Id.)

In her testimony at trial, Katherine Potter from the UIA explained the apparent discrepancy between the representations on the application that the Debtor was both presently employed by the City of Grand Rapids and separated for lack of work. She stated that, at the time the Debtor's application was completed in 2010, the Agency only offered limited options for a claimant's separation from their prior employment. (Trial Transcript, AP Dkt. No. 52, at 31, herein "Tr. at __.")  As a result, listing "lack of work" as the reason for separation could indicate that the claimant was either completely unemployed or underemployed due to a lack of full-time hours. (Id.)  It was not possible for the Agency to determine, based solely on a claimant's application, which of these applied. (Id.)

Ms. Potter also explained the general criteria the Agency utilizes when it evaluates a claimant's eligibility for benefits. When a claimant files a new claim for unemployment benefits, the Agency reviews the claimant's wages from the five quarters preceding the filing of the claim to determine whether the claimant is eligible to receive benefits. (Tr. at 43-44; Plf. Exh. 2 at 1-5.)  This quarterly wage information, which is obtained directly from employers pursuant to State reporting requirements, is also used to make a monetary determination as to the weekly benefit amount the claimant may be entitled to receive. (Tr. at 61; Plf. Exh. 2 at 2.)

Even if a claimant is eligible for unemployment benefits based on past wages, he or she may be disqualified from receiving benefits if other criteria are not met. (Plf. Exh. 2 at 1, 5.)  For instance, upon the Agency's initial review of the Debtor's application, he was disqualified from receiving benefits because he had been terminated from his employment with Mac's Convenience Stores for misconduct. (Tr. at 54.)  The Debtor

protested that original determination, and the Agency issued a redetermination which again found him to be disqualified.  (Tr. at 54-55.)  The Debtor appealed the redetermination to an administrative law judge, who held that the Debtor was not disqualified and allowed the benefits to be released.  (Tr. at 55.)

After a claimant establishes initial eligibility for unemployment benefits, the claimant is also required to certify his or her entitlement to actually receive the benefits by calling or logging on to the Michigan Automated Response Voice Interactive Network ("MARVIN") every two weeks.  (Tr. at 31.)  The MARVIN system requires claimants to answer a series of questions about their employment status for each week that they seek to collect benefits.  (Id.)  Among other things, the questions require claimants to certify that they are able and available to work full-time, seeking full-time work, and either unemployed or underemployed (i.e., only working part-time).  (Plf. Exh. 2 at 8.)  The questions asked by MARVIN, and information about how to answer them, are included in a guide entitled "Unemployment Benefits in Michigan:  A Handbook for Unemployed Workers" that is given to all unemployment claimants.  (Plf. Exh. 2, herein the "Handbook," at 13.)

A section of the Handbook entitled, "BEFORE YOU CALL MARVIN – How to Properly Report Earnings for Each Week" explains the effect that part-time earnings may have on the weekly benefit amount a claimant is entitled to receive.  (Plf. Exh. 2 at 8.)  That section states:

> If you work less than full-time in a week, you may be paid unemployment benefits but your benefit amount will be reduced depending on how much you earned in each week.  If you return to work less than full-time and do not earn at least 1 ½ times your weekly benefit amount, you may claim (certify/report for) benefits . . . . When using MARVIN, *report total gross earnings for the week(s) you are claiming . . . .*

(Id. at 9, emphasis in original.)  The Handbook also cautions claimants that "[i]ncorrectly reporting or failing to report earnings is one of the most common errors made when collecting unemployment benefits."  (Id. at 8.)

On the MARVIN system, Questions 7 and 8 solicit the information required by the Agency to determine whether a claimant's benefit must be reduced due to other earnings during a particular benefit week.  Question 7 asks:

DID YOU WORK DURING WEEK ENDING SATURDAY, MM/DD/YYYY?

(Id. at 13.)  The relevant date is generated automatically based on when the certification is made.  (Tr. at 35.)  The Handbook instructs claimants that they must answer "yes" to this question if they "worked or had any employment during the week."  (Plf. Exh. 2 at 13.)  Question 8 then asks:

DID YOU HAVE EARNINGS, INCLUDING CASH PAYMENTS, VACATION PAY, HOLIDAY PAY, SEVERANCE PAY, OR OTHER WAGE CONTINUATION PAY?

(Id.)   With regard to answering this question, the Handbooks explains:  "If you had earnings, MARVIN will ask you to report them . . . ."  (Id.)  The Handbook also describes how to enter the requisite dollar amounts.  (Id.)  The Debtor testified that he received a copy of the Handbook and that he reviewed it.  (Tr. at 64.)

The unemployment benefits at issue in this adversary proceeding were received by the Debtor for the weeks ending January 23, 2010, through December 31, 2011.  (See Plf. Exh. 10.)  To obtain these benefits, the Debtor certified his eligibility through the MARVIN system.  (Plf. Exh. 5.)  For each of the 102 weeks during this time period, the Debtor answered the question "did you work this week?" by stating "no."  (Id.)  The "Gross Earnings Received" section, which displays the claimant's response to Question 8

regarding earnings and other payments, states "0.00" on each of the 102 certifications made by the Debtor through MARVIN for the weeks at issue. (Id.) This reflects that he consistently answered Question 8 "no." (Tr. at 42.)

These representations to MARVIN were unquestionably false. During the vast majority of the time period at issue, the Debtor was employed by, and receiving wages from, the City of Grand Rapids. (Tr. at 65.) Marianne Peterson from the City of Grand Rapids testified that the Debtor worked for the City's Parks and Recreation Department from 2008 until December 2, 2011. (Tr. at 24-25.) From January 23, 2010, through December 2011, the Debtor earned a total of $15,806.03 from the City. (Tr. at 25.)

The Debtor admits that he failed to disclose his employment with the City of Grand Rapids and the wages he received from that employment when he certified his eligibility for benefits via the MARVIN system. (Tr. at 65-66.) He further acknowledges that, as a result, the representations he did make to the Agency through the MARVIN system were untrue. (Tr. at 66.) He asserts, however, that he did not disclose his employment based on instructions given to him by a UIA representative. The Debtor was not able to identify this Agency representative by name, but testified that he spoke with her at the Agency's office on Plainfield Avenue, in Grand Rapids, when he first applied for benefits in January 2010. (Tr. at 68, 75.) According to the Debtor, the UIA representative told him that the Agency would receive information about his employment with the City of Grand Rapids directly from the City and that he "just need[ed] to answer MARVIN how [he had] been answering MARVIN when [he] call[ed] in." (Tr. at 75.) Essentially, the Debtor took these comments to mean that the Agency already had his wage information from the City, and that he did not need to disclose that information through MARVIN. (Id.)

In January 2011, the Debtor was required to file a new claim for unemployment benefits.[2]  When the UIA evaluated the new claim to determine whether the Debtor was eligible and qualified to collect benefits, the Agency reviewed the Debtor's wages from the prior five quarters.  (Tr. at 43-44, 61.)  Upon this review, the Agency found that the Debtor had sufficient earnings from the City of Grand Rapids during those five quarters to qualify for a new unemployment claim.  (Tr. at 43-44.)  The Agency also discovered that the Debtor had been collecting unemployment benefits during that time period, but had not reported his part-time earnings.  (Tr. at 44.)  As a result, the Agency commenced a "fact-finding" investigation, to "determine what happened" and find out "why [the Debtor] was collecting benefits and working without informing the Agency." (Id.)  On January 18, 2011, the Agency sent the Debtor the first of two "Inquir[ies] Regarding Possible Overpayment."  (Plf. Exh. 7.)  The inquiry states that the Agency had recently received information indicating that the Debtor "may have intentionally misled" the UIA into paying unemployment benefits "for the period from 1/23/10 through 1/15/11 . . . ." and asks the Debtor to provide specific information regarding his earnings from the City.  (Id. at 1.)  The Debtor received and responded to this first inquiry.  (Tr. at 66-67.)  His handwritten response, which was dated January 18, 2011, indicates that he had been working for the City of Grand Rapids since June of 2008.  His response further states:

> . . . . I did not intentionally do this[.]  I really didn't know I had to report wages every time MARVIN asked me that[.]  I thought [that] was wages from a new job if I had one and the City of Grand Rapids job was old[.]
>
> I didn't know.

---

[2]     Ms. Potter explained that the Debtor's original claim, which was filed in January 2010, was valid for a fifty-two week "benefit year."  To continue receiving benefits after the initial fifty-two weeks passed, the Debtor was required to file a new claim.  In this case, the Debtor filed his new claim in January 2011.  (Tr. at 51.)

(Id. at 2.)   Nothing in the Debtor's response to the first inquiry indicates that he was instructed not to report his wages from the City by an employee of the UIA.  (Tr. at 69.)

Despite receiving this first Inquiry Regarding Possible Overpayments in January 2011, the Debtor did not alter the way in which he reported his income from the City of Grand Rapids to MARVIN.  (Tr. at 45-46; 67.)  By January 2012, the Agency still had not made a decision as to whether the Debtor had been overpaid for the time period covered by the first inquiry (i.e., January 2010 through January 2011).  (Tr. at 45.)  However, when the UIA reviewed the Debtor's file in January 2012, it discovered that the Debtor's failure to report his income and the resulting overpayments may have continued throughout 2011.[3]  (Id.)  As a result, on January 31, 2012, the Agency sent the Debtor a second fact-finding inquiry, covering an additional year's worth of benefits.  (Plf. Exh. 9.)  In response to the second inquiry, the Debtor submitted a type-written response that stated:

> . . . .  I have received a letter stating that I have intentionally misled the UIA into giving me benefits.  In the letter it states that I have not reported any of my wages.  I was told by an unemployment employee that my wages get reported by my job so that gave me every reason to think that when Marvin gave me the amount it was a fixed amount of what I was supposed to receive . . . .  I need to understand what I have did [sic] wrong because I did not do anything wrong to misled [sic] or misrepresent the fact.

(Id. at 3.)

---

[3]     Ms. Potter testified that the prior fact-finding inquiry, which was sent by the Agency in January 2011, could not have included inquiries regarding payments made 2011 because the Agency is only allowed to "ask questions pertaining to the weeks up until that point."  (Tr. at 46.)

After receiving and reviewing the Debtor's responses, the Agency issued a Notice of Determination or Redetermination[4] of benefits on March 28, 2012.[5]  (Plf. Exh. 10, the "Redetermination.")  The Redetermination states, in a section entitled "FINDINGS OF FACT AND REASON":

> An investigation reveals you collected benefits for various weeks 1/23/10 through 12/31/11 while working for CITY OF GRAND RAPIDS.  You failed to report your earnings . . . .  Your actions are considered to have been intentional because you failed to disclose a material fact to obtain benefits. You must pay to the Agency, in cash or deduction from benefits, restitution in the amount of $7,984.00 . . . . and penalties of $31,416.00 . . . .

(Id. at 1.)  Attached to the Redetermination is a chart showing the benefit payments that were made to Debtor each week, the amount that should have been paid if the Debtor's other income had been properly reported, and the difference between the two amounts, which represents the overpayment received by the Debtor.  (Id. at 2-8.)  The Debtor has not disputed the Agency's determinations regarding the amount of the debts for restitution, interest, or penalties.[6]  (See Defendant's Amended Responses to Plaintiff's First Request for Admissions, AP Dkt. No. 51, at ¶ 7, ¶ 8, ¶ 9.)

---

[4]     Ms. Adat-Blundell explained that a decision made when a claimant is not receiving benefits is a "determination."  Because payment of benefits may itself be considered a "determination," a decision made after a claimant has already received benefits is considered by the Agency to be a "redetermination."  (Tr. at 21-22.)  The document sent to the Debtor on March 28, 2012, was a redetermination of benefits.  (Tr. at 47.)

[5]     The Agency's complaint alleges that the UIA actually issued three separate Redeterminations on March 27, 28, and 29, 2012.  Only the March 28, 2012 Redetermination was entered into evidence at the trial, and that is the Redetermination the court has relied upon in this opinion.

[6]     The Agency's complaint states that the total amount of restitution owed by the Debtor for the overpayments is $8,054.00.  The total amount of restitution reflected in the March 28, 2012 Redetermination is $7,984.00.  The $70.00 discrepancy appears to be attributable to an overpayment for the week ending May 29, 2010, which is included in

At trial, Ms. Adat-Blundell provided a brief explanation of the process by which this administrative Redetermination was made.  She stated that the Redetermination was issued by an UIA examiner, after review of all of the information available to the Agency, including the responses provided by the claimant.  Although Ms. Adat-Blundell stated that she had not "really looked at the case material" regarding the Debtor's specific claim, she testified that no hearing was held prior to Redetermination being made in the Debtor's case.  (Tr. at 19-20.)

The Redetermination also informed the Debtor that he had the right to contest the Agency's conclusions, stating:

> IF YOU DISAGREE WITH THIS (RE)DETERMINATION, SEE PROTEST/APPEAL RIGHTS ON THE REVERSE SIDE.

(Id.)  The "reverse side" of the notice is not included in Plaintiff's Exhibit 10.  However, at trial, Ms. Adat-Blundell explained that a claimant generally has thirty (30) days to protest or appeal a redetermination issued by the Agency.  (Tr. at 13.)  If an appeal is timely filed, it is heard by an administrative law judge ("ALJ") through the Michigan Administrative Hearing System ("MAHS").   (Tr. at 14; 22.)  The ALJ is not associated with the Agency, and conducts an informal hearing at which parties may be represented by counsel, and may present evidence and examine witnesses.  (Tr. at 14-15.)  After the ALJ renders a

---

the documents attached to the complaint, but not on the list of overpayments attached to the Redetermination.

In addition, the court notes that four times the restitution amount of $7,984.00 equals $31,936.00.   The amount of statutory fraud penalties imposed in the Redetermination is $31,416.00.  Again, because the parties have not disputed these calculations, the court has relied on the amounts stated in the March 28, 2012 Redetermination for purposes of this opinion.

decision, further appeals may be taken to the Michigan Compensation Appellate Commission ("MCAC") and to the state circuit courts.  (Tr. at 15-17.)

In his initial response to a request for admissions sent by the Agency in this adversary proceeding, the Debtor asserted that he appealed the administrative Redetermination by faxing a letter to the UIA from the Michigan Works office on Leonard and Ball Streets in Grand Rapids.  (See Defendant's Responses to Plaintiff's First Requests for Admissions at ¶ 6, attached to Defendant's Response to Motion for Summary Judgment, AP Dkt. No. 24 as Exh. 1.)  The UIA had no record of any such appeal.  (See Affidavit of Doris Mitchell at ¶ 16, attached to Plaintiff's Motion for Summary Judgment, AP Dkt. No. 21 as Exh. 3.)  At trial, and in an amended response filed a less than a week prior to the trial, the Debtor changed his position and asserted that he never received the March 28, 2012 Redetermination.   (Tr. at 79; Defendant's Amended Responses to Plaintiff's First Request for Admissions, AP Dkt. No. 51.)  Either way, it is undisputed that no timely appeal was ever received by the Agency.

The Debtor filed his chapter 7 bankruptcy case on April 21, 2014.  The Agency filed this adversary proceeding on July 28, 2014, asking this court to determine that the debts owed by the Debtor to the UIA for restitution and statutory interest are nondischargeable under § 523(a)(2)(A) and that the statutory penalties are also nondischargeable under § 523(a)(7).

## IV.   DISCUSSION.

There is no question that the Debtor in this case was overpaid unemployment benefits because he failed to disclose his part-time employment with the City of Grand Rapids when he certified his eligibility for benefits to the Agency.   When the UIA

discovered the overpayments, it conducted an administrative investigation and subsequently issued its Redetermination of benefits. The Redetermination included several findings, all made in accordance with the applicable provisions of the Michigan Employment Security Act ("MES Act"). See Mich. Comp. Laws § 421.1 et seq. First, the UIA found that the Debtor had been overpaid benefits as a result of his failure to report his part-time earnings. See Mich. Comp. Laws § 421.27(c) (providing that a claimant's unemployment benefits are to be offset by the claimant's earnings and setting forth a formula for calculating the appropriate amounts). As a result of the overpayments, the Redetermination found that the Debtor owed the Agency $7,984.00 in restitution, as well as statutory interest on the restitution amount. See Mich. Comp. Laws § 421.62(a) (permitting the UIA to recover improperly paid benefits plus interest); see also Mich. Comp. Laws § 421.15(a) (setting the interest rate on such restitution obligations at 1% per month or 12% per annum).

The Redetermination also included a finding that the Debtor's actions were "considered to have been intentional" because he "failed to disclose a material fact to obtain benefits." See Plf. Exh. 10. Based on this finding, the Redetermination found the Debtor liable for statutory fraud penalties under § 54(b) of the MES Act. See Mich. Comp. Laws § 421.54(b) (authorizing the Agency to impose penalties on a claimant "who makes a false statement or representation knowing it to be false, or knowingly and willfully with intent to defraud fails to disclose a material fact" in order "to obtain or increase a benefit or other payment" under the MES Act). The Redetermination set the amount of the penalties at $31,416.00, which is roughly four times the restitution amount.[7] See Mich.

---

[7]     See supra note 6.

Comp. Laws § 421.54(b)(i)-(ii) (providing that, if the amount of restitution is over $500, the statutory penalties are quadruple the amount of the restitution).

This adversary proceeding requires the court to determine whether, and to what extent, the obligations imposed by the prior administrative Redetermination are dischargeable in the Debtor's chapter 7 case. Specifically, the Agency asserts that the debts for restitution and statutory interest are nondischargeable because the overpaid benefits were obtained by the Debtor through false pretenses, a false representation, or actual fraud under § 523(a)(2)(A). The Agency argues that the statutory penalties assessed against the Debtor are nondischargeable under § 523(a)(7) as penalties "payable to and for the benefit or a governmental unit" that are "not compensation of actual pecuniary loss."

In determining the dischargeability of a particular debt, this court is generally bound, under the doctrine of collateral estoppel or issue preclusion, by factual findings that were actually litigated and necessarily decided in a prior state or federal court action. See Grogan v. Garner, 498 U.S. 279, 284 n.11, 111 S. Ct. 654, 658 n. 11 (1991). Here, the prior Redetermination was made by the Agency, and was not reviewed by a court or incorporated in a state court judgment. Notwithstanding this fact, the UIA asserts that the factual findings made in the Redetermination are entitled to preclusive effect in this adversary proceeding. The Debtor does not dispute the Agency's findings regarding the Debtor's receipt of overpayments, the amount of the debt for restitution, or the amount of the statutory penalty imposed. See, e.g., Defendant's Amended Responses to Plaintiff's First Request for Admissions, AP Dkt. No. 51, at ¶ 7 and ¶ 8.; Tr. at 65-66. The Debtor asserts, however, that he did not intend to deceive the Agency by failing to accurately

report his income through MARVIN, and he argues that the factual findings to the contrary in the prior Redetermination are not entitled to preclusive effect in this nondischargeable debt adversary proceeding.  The UIA counters that, even if the factual findings in the prior Redetermination are not entitled to preclusive effect, the elements of its nondischargeable debt causes of action were established by the evidence submitted at trial.  The court will address each of these arguments below.

A.   *Preclusive Effect of Prior Administrative Redetermination*.

As previously stated, the administrative Redetermination issued by the UIA on March 28, 2012, includes several findings regarding the overpayment of benefits and the Debtor's resulting indebtedness to the Agency.   Of particular importance in this nondischargeability proceeding is the UIA's finding that the Debtor's actions in failing to disclose "material facts" about his employment and income were "considered to have been intentional."  See Plf. Exh. 10.  Based on this finding, the UIA also assessed statutory penalties against the Debtor under § 54(b) of the MES Act.  See Mich. Comp. Laws § 421.54(b).  The Agency argues that these findings in the prior Redetermination, which was not appealed by the Debtor, preclude the Debtor from relitigating the issue of his fraudulent intent in this adversary proceeding.

Although the federal full faith and credit statute, 28 U.S.C. § 1738, applies only to prior state court judgments, the United States Supreme Court has established a common law rule that gives preclusive effect to state administrative decisions in appropriate circumstances. See University of Tenn. v. Elliott, 478 U.S. 788, 794-99, 106 S. Ct. 3220, 3224-26 (1986); see also Astoria Federal Savings & Loan Ass'n v. Solimino, 501 U.S. 104, 107, 111 S. Ct. 2166, 2169 (1991) (noting that the Supreme Court has "long favored

application of the common-law doctrines of collateral estoppel (as to issues) and res judicata (as to claims) to those determinations of administrative bodies that have attained finality"). In Elliott, the Court held that unless Congress creates an exception, "when a state agency 'acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." Elliott, 478 U.S. at 799, 106 S. Ct. at 3226 (internal citation omitted). The Supreme Court explained that "giving preclusive effect to administrative factfinding" in such instances "serves the value underlying general principles of collateral estoppel: enforcing repose." Elliott, 478 U.S. at 798, 106 S. Ct. at 3226. That value "encompasses both the parties' interest in avoiding the cost and vexation of repetitive litigation and the public's interest in conserving judicial resources." Id.

However, even though "[a]dministrative preclusion 'is favored as a matter of general policy,'" the Sixth Circuit has noted that "its suitability may vary according to . . . the relative adequacy of agency procedures." Herrera v. Churchill McGee, LLC, 680 F.3d 539, 547 (6th Cir. 2012). In Herrera, the Sixth Circuit explained that it "is difficult to state a general formula to capture the essential elements of adjudicatory procedure" that would entitle an administrative determination to preclusive effect in a subsequent judicial proceeding. Id. (citation omitted); see also Roberson v. Torres, 770 F.3d 398, 404-05 (6th Cir. 2014) ("the question of preclusion cannot be resolved categorically as it turns on case-specific factual questions" as well as "on the court's 'sense of justice and equity'") (citations omitted). It suggested, however, that "[a]n administrative board acts in a judicial capacity when it hears evidence, gives the parties an opportunity to brief and argue their

versions of the facts, and the parties are given an opportunity to seek court review of any adverse findings."  Id. (quoting Nelson v. Jefferson County, 863 F.2d 18, 19 (6th Cir. 1988)).

Even if the requirements of Elliott are met, the state administrative findings are only entitled to preclusive effect in this bankruptcy court if they would be given such effect in the Michigan state courts.  When a prior determination is rendered by an administrative agency, the Michigan Supreme Court has held that "the general principles of collateral estoppel are to be applied only when the procedures are adjudicatory in nature, when a method of appeal is provided, and when it is clear that the Legislature intended to make the determination final in the absence of an appeal."[8]  Storey v. Meijer, Inc., 429 N.W.2d 169, 171-72 (Mich. 1988) (citing Senior Accountants, Analysts & Appraisers Ass'n v. Detroit, 249 N.W.2d 121 (Mich. 1976); Roman Cleanser Co. v. Murphy, 194 N.W.2d 704, 706 n.5 (Mich. 1972) (noting these requirements and giving preclusive effect to an administrative determination made by the Michigan Employment Security Commission, but providing no analysis regarding the "adjudicatory" nature of the prior determination)). To determine whether an administrative agency's procedures are adjudicatory in nature, Michigan courts "compare the agency's procedures to court procedures" and "determine whether they are similar."  William Beaumont Hosp. v. Wass, __ N.W.2d __, 2016 WL

---

[8]     The "general principles of collateral estoppel" that apply under Michigan law are whether:  (1) the question of fact was essential to the judgment and determined by a valid and final judgment; (2) the same parties had a full and fair opportunity to litigate the issue; and (3) there is mutuality of estoppel.  Monat v. State Farm Ins. Co., 677 N.W.2d 843, 845-46 (Mich. 2004).  Determining the preclusive effect of administrative factfinding under Michigan law is therefore a "two stage" process.  See Roberson v. Torres, 770 F.3d 398, 404 (6th Cir. 2014) (citations omitted).  For the reasons discussed below, the court finds that the Agency's procedures were not adjudicatory in nature, and therefore, it need not analyze the general elements of collateral estoppel in this proceeding.

2888727 (Mich. App. May 17, 2016) (citing Natural Resources Defense Council v. Dep't of Environmental Quality, 832 N.W.2d 288 (Mich. App. 2013)). "Quasi-judicial proceedings include procedural characteristics common to courts, such as a right to a hearing, a right to be represented by counsel, the right to submit exhibits, and the authority to subpoena witnesses and require parties to produce documents."[9] Id.

In this adversary proceeding, the Debtor had the right to appeal the Agency's administrative decisions, but did not do so. The court also finds that the Michigan Legislature intended to make determinations issued by the UIA final in the absence of an appeal. See Op. Att'y Gen. No. 4628 (Mar. 25, 1968). However, the court concludes that the evidence presented by the Agency at trial failed to establish that it was acting in a "judicial capacity" under Elliott or that the procedures it utilized were "adjudicatory in nature" under Michigan law when it rendered its Redetermination finding that the Debtor had intentionally and fraudulently misled the Agency. The UIA representatives who testified at trial explained that the investigation into the potential overpayments received by the Debtor was initiated when the Debtor filed his second claim for benefits in January 2011. Upon reviewing the new claim, the UIA discovered that the Debtor had been working for the City of Grand Rapids and collecting benefits during 2010. The UIA's investigation resulted in inquiries, to which the Debtor responded. An examiner within the

---

[9] A more thorough analysis on the requirement that an administrative agency proceeding was "adjudicatory in nature" was included in this court's bench opinion denying the Agency's motion for summary judgment. See Transcript of Bench Opinion Denying Plaintiff's Motion for Summary Judgment and Defendant's Counter-Motion for Summary Judgment, AP Dkt. No. 42, at 18-21 (citing Nummer v. Treasury Dept., 533 N.W.2d 250 (Mich. 1995); Wenona Ltd. v. Bangor Charter Township, 2002 WL 1424438 (Mich. App. June 28, 2002); and Sloan v. Chelsea Community Hospital, 2011 WL 5454567 (Mich. App. Nov. 10, 2011)). The court's prior discussion of these cases is incorporated by reference herein.

Agency reviewed the Debtor's responses and the other information available, and issued the March 28, 2012 Redetermination finding that the Debtor had intentionally failed to disclose his part-time earnings from the City of Grand Rapids in order to obtain benefits. The examiner who conducted the fact-finding was not identified.  There was no hearing. There are no facts in the record to indicate what the examiner's qualifications were.  There is no evidence as to whether he or she considered the Debtor's responses to the inquiries, and if so, how he or she might have weighed the evidence.  There is no evidence establishing what standard of proof was used.   The examiner did not testify at the trial in in this court to explain his or her decision-making.  There is no evidence suggesting that the Redetermination proceeding possessed any characteristics of being "quasi-judicial." The only part of the process that was even remotely "adjudicatory" was the right to appeal. The Debtor testified that he did not receive the Redetermination and therefore was unable to exercise his appeal rights.  Although the credibility of this statement was somewhat diminished by the Debtor's prior position that he had appealed the decision, his testimony raises a question about the adequacy of the notice and opportunity to appeal the Redetermination.

Based on these facts, this court finds that the UIA was not "acting in a judicial capacity" and that the Debtor was not given a full and fair opportunity to litigate the Agency's allegations against him, so as to entitle the factual findings of the prior Redetermination to collateral estoppel effect under Elliott.  Likewise, the court concludes that a Michigan state court reviewing the Redetermination would not give preclusive effect to the factual findings made therein, because the procedures utilized by the Agency in making those findings were not adjudicatory in nature.  The factual findings in the prior

Redetermination are not sufficient to establish the requisite elements of the Agency's nondischargeable debt causes of action.   As a result, this court must consider whether the elements of the Agency's nondischargeable debt claims under § 523(a)(2)(A) and § 523(a)(7) were established by the evidence presented at trial.

B.  *11 U.S.C. § 523(a)(2)(A)*.

Section 523(a)(2)(A) of the Bankruptcy Code provides that any debt "for money, property, services, or an extension, renewal, or refinancing of credit," is nondischargeable "to the extent obtained by . . . false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition."   11 U.S.C. § 523(a)(2)(A).  To except a debt from discharge under § 523(a)(2)(A), the creditor must show that:

(1)     the debtor obtained money through a material misrepresentation that, at the time, the debtor knew was false or made with gross recklessness as to its truth;
(2)     the debtor intended to deceive the creditor;
(3)     the creditor justifiably relied on the false representation; and
(4)     its reliance was the proximate cause of loss.

Rembert v. AT&T Universal Card Servs., Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998) (citing Longo v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir. 1993)); Flagstar Bank, FSB v. Stricker (In re Stricker), 414 B.R. 175, 181 (Bankr. W.D. Mich. 2009).   The creditor must establish each of these elements by a preponderance of evidence.   See Grogan v. Garner, 498 U.S. 279, 291, 111 S. Ct. 654, 661 (1991). Exceptions to discharge are strictly construed against the creditor.   Rembert, 141 F.3d at 281 (citing Manufacturer's Hanover Trust v. Ward (In re Ward), 857 F.2d 1082, 1083 (6th Cir. 1988)).

1.   *Material Misrepresentations.*

There is no dispute that the Debtor made misrepresentations to the Agency when he certified his eligibility for unemployment benefits through MARVIN, but failed to disclose his part-time employment and wages from the City of Grand Rapids.  During the time period at issue in this adversary proceeding, the Debtor completed MARVIN certifications for 102 benefit weeks.  Each time he contacted MARVIN, he was asked if he was working, and if so, how much income he had received during the relevant time period.  Each time, the Debtor reported he was not working and had received no wages, despite the fact that he was working and earning income from the City of Grand Rapids throughout this time period.

2.   *Justifiable Reliance.*

To prevail on its § 523(a)(2)(A) cause of action, the Agency must also establish that it relied on the certifications made by the Debtor through the MARVIN system and that its reliance was justified.  See Field v. Mans, 516 U.S. 59, 74-75, 116 S. Ct. 437, 446 (1995) (holding that a creditor's reliance under § 523(a)(2)(A) need only be subjectively "justified" and not objectively "reasonable"); First Horizon Home Loan Corp. v. Apostle (In re Apostle), 467 B.R. 433, 443 (Bankr. W.D. Mich. 2012) (The justifiable reliance standard "requires proof that a plaintiff actually relied upon the defendant's false representations and that such reliance was justified under the circumstances.") (citations omitted).  Under the justifiable reliance standard, a creditor, such as the Agency, is not required to make an independent investigation into the truth or falsity of every representation.  See Willens v. Bones (In re Bones), 395 B.R. 407, 432 (Bankr. E.D. Mich. 2008); see also 2 Fowler V. Harper et al., Harper, James and Gray on Torts, § 7.12, 537 (3d ed. 2007) (explaining

that "the change in the law's requirement of diligence" on the part of one who is the victim of an intentional misrepresentation from reasonable to justifiable reliance reflects a "shift in ethical standards accepted by the community;" under the "great weight" of modern authority, "[t]he failure of [a] plaintiff to use ordinary diligence to make an investigation or otherwise discover the truth of the matter will ordinarily not bar his recovery from one who has consciously deceived him").

However, as the United States Supreme Court noted in Field v. Mans, "[j]ustifiability is not without some limits." Field v. Mans, 516 U.S. at 71, 116 S. Ct. at 444. The creditor is "required to use his senses, and cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." Field v. Mans, 516 U.S. at 71, 116 S. Ct. at 444 (citing Restatement (Second) of Torts § 541, cmt. a (1976)). This rule applies "only when the recipient of the misrepresentation is capable of appreciating its falsity at the time by use of his senses." Id. Justification, therefore, is based upon "an individual standard of the plaintiff's own capacity and the knowledge which he has, or which may fairly be charged against him from the facts within his observation in the light of his individual case." Id. (citing W. Prosser, Law of Torts § 108, at 717 (4th ed. 1971)); see also Dan B. Dobbs et al., Dobbs' Law of Torts § 673 (2d ed. 2016) (noting that the "strength of the 'notice' to the plaintiff that investigation may be needed" is dependent on a number of factors including "the obscurity or obviousness of the contradiction in the defendant's statements" and the "relationship of the parties").

Other courts that have considered the issue have concluded that it is justifiable for state unemployment agencies to rely on "weekly certifications to determine an applicant's

eligibility for benefits over specific periods of time." See Ohio Dept. of Job & Family Servs. v. Yuppa (In re Yuppa), 2013 WL 4854479 (Bankr. S.D. Ohio June 12, 2013) (unpublished opinion) (citing State of Colorado ex rel. Central Collection Serv. v. O'Brien (In re O'Brien), 110 B.R. 27, 32-33 (Bankr. D. Colo. 1990) (holding, in a decision pre-dating Field v. Mans, that the state unemployment agency satisfied a reasonable reliance standard). Discussing the Colorado unemployment system, the O'Brien court explained:

> The process relies on the honest claimant to carry out the intent of the legislature. If we were to require more, that is, an immediate investigation to ensure only truly unemployed persons receive benefits, the system would bog down in delayed payments with the overwhelming burden of unemployment falling on those who deserve it the least, the honest and misfortunate unemployed worker and his family. We cannot see where Colorado is required to do more than satisfy the statutory mandate.

In re O'Brien, 110 B.R. at 33.

Like the Colorado statute, the purpose of the Michigan Employment Security Act is to "lighten the burden of economic insecurity on those who become unemployed through no fault of their own." Empire Iron Mining P'ship v. Orhanen, 565 N.W.2d 844, 848 (Mich. 1997) (citing Kalamazoo Tank & Silo Co. v. Unemployment Compensation Comm'n, 36 N.W.2d 226 (Mich. 1949)). To that end, Michigan courts have held that provisions of the MES Act are to be liberally construed to effect coverage and strictly construed to effect disqualification. Id. at 847-48 (quoting Chrysler Corp. v. Smith, 298 N.W. 87 (1941) (McAllister, J., dissenting) (suggesting that the MES Act should be interpreted in a manner that results "in the allowance of the claims, rather than their denial")).

The evidence in this case establishes, without question, that the Agency relied on the Debtor's MARVIN certifications when it determined his eligibility for benefits and the

amount of benefits he was actually entitled to receive.  Under the circumstances of this case, including the relationship of the parties, their relative knowledge of the pertinent facts, and the overall purpose of the MES Act, the court concludes that it was justifiable for the Agency to rely on the veracity of the representations made by the Debtor via the MARVIN system.  Arguably, the Agency's reliance on the Debtor's certifications was less justified after it discovered, in connection with the filing of the Debtor's second claim in January, 2011, that the Debtor had been working for the City of Grand Rapids throughout 2010.  The Agency did commence an investigation, but the investigation was "backward-looking," in the sense that it concerned only amounts that had already been paid to the Debtor.   The Agency continued to rely on the Debtor's MARVIN certifications as accurately reporting his employment and income on a go-forward basis and there is no evidence in the record showing that the Agency received wage information after the filing of the Debtor's second claim.  Although it is a close question, under the circumstances of this case, the court cannot conclude that knowledge of the Debtor's 2010 part-time earnings was sufficient to render his misrepresentations about lack of other employment during 2011 so patently obvious that the Agency's reliance on the statements without further investigation into their accuracy was not justified.  Therefore, the court finds that the Agency's reliance on the Debtor's MARVIN certifications was justified even after it received information about the Debtor's past employment in January 2011.

   3.  *Causation.*

   The Agency has also established that its reliance on the Debtor's inaccurate MARVIN certifications caused it to overpay the Debtor benefits.  Had the Debtor accurately reported his income from the City of Grand Rapids, his weekly benefits would

have been reduced in accordance with the statutory formula. See Mich. Comp. Laws § 421.27(c) (providing for a reduction in a claimant's benefit rate for weeks a claimant earns other income). The Debtor's failure to accurately report his employment status and income through MARVIN resulted in the overpayment of benefits from the Agency to the Debtor.

4. *Intent to Deceive.*

Because the Agency has successfully established the misrepresentation, reliance, and causation elements of its § 523(a)(2)(A) cause of action, the dispositive issue on its fraud claim is whether the Debtor, in failing to accurately disclose his employment status and income, intended to deceive the Agency. The Debtor argues that he had no intent to deceive the Agency. Rather, he asserts that he subjectively believed that he was reporting his income correctly, based on the advice of an unidentified UIA representative. The Agency disagrees. Although this court has held that the Debtor's intent to deceive was not established by the prior administrative Redetermination, the preponderance of evidence presented at trial compels the conclusion that the Debtor intended to deceive the UIA when he misrepresented his employment status to the Agency through his MARVIN certifications.

The Sixth Circuit has previously held that "a debtor's intention – or lack thereof – must be determined by the totality of the circumstances." In re Rembert, 141 F.3d at 282. In this case, the Debtor certified for unemployment benefits through MARVIN for 102 weeks. Each time, he was asked if he was working; each time, he answered, "no." The repeated and on-going nature of the Debtor's misrepresentations suggest that he intended to mislead the Agency. See In re Yuppa, 2013 WL 4854479 at *4 (holding that

"[r]epeated misrepresentations of employment status when applying for benefits are sufficient to prove fraudulent intent") (citing In re O'Brien, 110 B.R. at 31-32; Arizona Dept. of Economic Security v. Kaliff (In re Kaliff), 2 B.R. 465, 468 (Bankr. D. Ariz. 1979)).

Based on the other circumstances surrounding the Debtor's misrepresentations, his assertion that he was reporting his part-time employment and income in accordance with instructions given by a UIA employee is not credible.  The Debtor could not identify the individual who gave him this dubious advice, and his explanations about what was said during this conversation were both confusing and contradictory.  For instance, the Debtor claimed the employee told him to report to MARVIN the same was as he had been reporting.  However, that conversation allegedly occurred in January 2010, when the Debtor filed his first claim.  At that time, he had not yet become eligible for benefits and the record does not contain any other evidence that the Debtor had a prior history of reporting to MARVIN.  Also, the Debtor's written response to the Agency's initial fact-finding inquiry did not disclose his belief that the UIA employee had instructed him not to report his income.  Even if the Debtor was told he was not required to report his part-time earnings, the inaccuracy of that statement is readily apparent from a review of the written Handbook provided to the Debtor, which provides clear information regarding the necessity of disclosing part-time employment and income, as well as instructions for how to do so when reporting through MARVIN.

For these reasons, the court finds that the Debtor misrepresented his employment status and other earnings through MARVIN with the intent to deceive the Agency.  The restitution debt owed by the Debtor to the UIA as a result of the overpayment of benefits, in the amount of $7,984.00, and the accrued interest thereon, in the amount of $1,902.58,

is nondischargeable under § 523(a)(2)(A).[10]  See also Cohen v. de la Cruz, 523 U.S. 213, 118 S. Ct. 1212 (1998).

      C.  *11 U.S.C. § 523(a)(7)*.

The Agency also argues that the statutory penalties assessed against the Debtor as a result of the overpayments are nondischargeable under § 523(a)(7).  Again, the penalties at issue were imposed by the Agency under § 54(b) of the MES Act, which permits the UIA to assess a penalty when a claimant "makes a false statement or representation knowing it to be false, or knowingly and willfully with intent to defraud fails

---

[10]    In its Proposed Findings of Fact and Conclusions of Law filed just prior to the trial in this adversary proceeding, the Agency argued, for the first time, that the statutory penalties should also be excepted from discharge under § 523(a)(2)(A) as interpreted by the Supreme Court in Cohen v. de la Cruz.  The issue of whether statutory penalties may be excepted from discharge under § 523(a)(2)(A), or whether the dischargeability of such penalties is to be addressed separately under § 523(a)(7), is the subject of a split of authority.  The issue most often arises in chapter 13 cases, where debts for fines, penalties or forfeitures under § 523(a)(7) are dischargeable, but debts for amounts obtained by fraud are not.  11 U.S.C. § 1328(a); compare Michigan Unemployment Insurance Agency v. Andrews (In re Andrews), 2015 WL 5813418 (Bankr. E.D. Mich. Oct. 2, 2015) (conditionally granting defendant's motion to dismiss Agency's claim that penalties are nondischargeable  under § 1328(a)(2) and § 523(a)(2)(A); in a chapter 13 case, a debt for statutory penalties may not be excepted from discharge under § 1328(a)(2) and § 523(a)(2)(A), even if the penalties arose from a debtor's fraud; such debts are addressed separately in § 523(a)(7) and are not among the types of debts excluded from chapter 13 "super discharge" under § 1328(a)) with Michigan Unemployment Insurance Agency v. Kozlowski (In re Kozlowski), 547 B.R. 222 (Bankr. E.D. Mich. 2016) (denying motion to dismiss Agency's nondischargeable debt cause of action for fraud under § 1328(a)(2) and § 523(a)(2)(A); under § 523(a)(2)(A), as interpreted by the Supreme Court in Cohen, "all debts arising from fraud" are excepted from discharge; this includes any penalties imposed by the Agency, even though the penalties may also be nondischargeable under § 523(a)(7)).

    This court has determined that it need not address this issue, which was not plead in the original complaint in this adversary proceeding and was raised belatedly by the Agency in its pretrial legal memoranda.  This is a chapter 7 case and, as explained below, the court finds that the debt for statutory penalties is excepted from discharge under § 523(a)(7).

to disclose a material fact to obtain or increase a benefit." Mich. Comp. Laws § 421.54(b). When the overpayment exceeds $500, the fraud penalty imposed is equal to four times the amount of the overpayment. Mich. Comp. Laws § 421.54(b)(ii). It is apparent from the language of § 54(b) that the Agency's assessment of the penalties under that section was predicated on its factual findings regarding the Debtor's fraudulent intent. This court has held that those factual findings are not entitled to preclusive effect in this adversary proceeding. Nevertheless, the Agency presented evidence at trial ratifying its previous imposition of the penalties and their amount. The Agency also established that the Debtor made multiple false statements in his MARVIN certifications with intent to deceive the UIA and in order to obtain benefits. As a result, this court concludes that the penalties were properly imposed and adopts the prior assessment of the penalties in the amount of $31,416.00.[11]

Section 523(a)(7) excepts from discharge any debt for a "fine, penalty, or forfeiture payable to or for the benefit of a governmental unit, [that is] not compensation for actual pecuniary loss," other than certain tax penalties. 11 U.S.C. § 523(a)(7); see also Love v.

---

[11] Neither party has addressed whether, in light of the Redetermination's lack of preclusive effect, this court is required to reevaluate the imposition of the statutory penalties or whether it has authority to do so. By presenting evidence regarding the penalties and their amount at trial, the Agency essentially readopted its prior assessment and asked this court to enter a nondischargeable judgment in that amount. Other than through implicit arguments regarding his lack of fraudulent intent, the Debtor did not directly challenge the prior assessment of the penalties or their amount.

In the absence of any dispute, and because the evidence at trial established that the penalties were properly assessed, this court has determined that the penalties are owed in the amount claimed by the Agency. This proceeding does not require the court to consider the questions that might arise if this court's independent factual findings were inconsistent with imposition of the penalties (for example, if this court found no intentional fraud). The ability of this court to revisit the assessment of penalties under such circumstances, and whether such determination should be made in this court or in another court of competent jurisdiction, are questions for another day.

Scott (In re Love), 442 B.R. 868, 871 (Bankr. M.D. Tenn. 2011) (interpreting § 523(a)(7) as requiring "proof of three elements:  (1) a debt payable to and for the benefit of a governmental unit;" (2) that is "in the nature of a fine, penalty or forfeiture;" and (3) that is "not compensation for actual pecuniary loss.") (citing Kelly v. Robinson, 479 U.S. 36, 50-51, 107 S. Ct. 353 (1986)).  In this adversary proceeding, there is no question that the UIA is a "governmental unit" and that the statutory penalties at issue are payable to and for the benefit of the Agency.  See 11 U.S.C. § 101(27) (defining "governmental unit to include a "department, agency, or instrumentality of . . . a State").  Accordingly, the focus of the court's analysis is whether the penalties are punitive in nature and are not compensation for actual pecuniary loss.

In Kelly v. Robinson, the United States Supreme Court held that a restitution order entered in a criminal case was excepted from discharge under § 523(a)(7).  In so holding, the Court explained that "[o]n its face" § 523(a)(7) "creates a broad exception for all penal sanctions, whether they be denominated fines, penalties, or forfeitures."  Kelly, 479 U.S. at 51, 107 S. Ct. at 362.  Although the restitution order at issue in Kelly conferred some benefit on the victim, the Court found that the award was generally imposed to further the penal goals of the state.   The Court observed that "[u]nlike an obligation which arises out of a contractual, statutory or common law duty, here the obligation is rooted in the traditional responsibility of a state to protect its citizens by enforcing its criminal statutes and to rehabilitate an offender by imposing a criminal sanction intended for that purpose."  Based on this language in Kelly, courts have extended its holding to punitive obligations in non-criminal contexts, so long as the other statutory requirements are met.  See, e.g., Whitehouse v. LaRoche, 277 F.3d 568, 573 (1st Cir. 2002) (holding that § 523(a)(7)

applies "both to civil and criminal penalties" if the particular penalty serves some "punitive" or "rehabilitative" governmental aim, "rather than a purely compensatory purpose") (citations omitted); State of Colorado ex rel. Central Collection Serv. v. O'Brien (In re O'Brien), 110 B.R. 27, 33 (Bankr. D. Colo. 1990)).

The Sixth Circuit Court of Appeals applied Kelly in a non-criminal context in Hughes v. Sanders, 469 F.3d 475 (6th Cir. 2006).  The debt in Hughes arose when an attorney, Sanders, was sued by a former client, Hughes, for legal malpractice.  A default judgment for damages, as well as attorney's fees and costs incurred by Hughes in the malpractice action, was ultimately entered against Sanders.  The issue before the Sixth Circuit was whether the resulting debt was nondischargeable under § 523(a)(7).  Because the debt was payable to an individual, Hughes, and not to a governmental entity, the Sixth Circuit concluded that the statutory requirements of § 523(a)(7) had not been met. Further, because the debt was in an amount "explicitly calculated to compensate Hughes for malpractice damages, litigation costs and attorney's fees" it also failed to satisfy the statutory requirement that the debt "not [be] compensation for actual pecuniary loss," despite the fact that the damages were imposed, at least in part, as a sanction for "inexcusable and unprofessional conduct."  (Id. at 479.)

The statutory penalties at issue in this case are distinguishable for the damages at issue in Hughes.  The penalties here are not compensation for the Agency's actual pecuniary loss, as evidenced by the fact that the amounts of the actual overpayments are dealt with separately by the restitution obligation.  Instead, it is clear from the plain language of § 54(b) that the purposes of the fraud penalties is to punish and deter fraud, and not to compensate the UIA for any actual loss.  The fact that the amount of the

penalties is calculated based on the amount of the actual overpayments does not alter the conclusion that the penalties imposed under the statute are primarily punitive in nature. Accordingly, the court holds that the $31,416.00 in statutory fraud penalties owed by the Debtor to the UIA is nondischargeable under § 523(a)(7). The court will enter a judgment in that amount.[12]

V.   CONCLUSION.

For the reasons set forth above, the court concludes that the Debtor owes the UIA a total debt of $41,595.58, consisting of $7,984.00 in restitution for overpaid benefits, $1,902.58 in statutory interest, $31,416.00 in statutory fraud penalties, and $293 in filing fees. The court further concludes that the debts for restitution and statutory interest are excepted from the Debtor's discharge under § 523(a)(2)(A) because the overpaid benefits were obtained by the Debtor's fraud, and that the statutory penalties are excepted from the Debtor's discharge under § 523(a)(7). A separate judgment shall be entered accordingly.

---

[12]   The court has considered whether it is appropriate to enter a money judgment in the amount of the nondischargeable claim for penalties. This court generally has jurisdiction to "adjudge the validity and amount of a claim together with its dischargeability." Longo v. McLaren, 3 F.3d 958, 965 (6th Cir. 1993) (explaining that "this is true" because it is often "impossible to separate the determination of dischargeability . . . from the function of fixing the amount of the nondischargeable debt"). The court has done so with respect to the penalties at issue in this adversary proceeding. See supra note 11. However, the imposition of statutory penalties under the MES Act is inherently a police power exercised by the state, and the court believes that in many instances, disputes regarding imposition of the penalties or their amount, are best resolved at the state level. See Mich. Comp. Laws § 421.2. In this case, there is no dispute about the amount of the penalties, and assessment of the penalties is entirely consistent with this court's independent findings regarding the Debtor's fraudulent intent. Therefore, under the facts of this case, the court has concluded that entry of a money judgment is appropriate.

**IT IS SO ORDERED.**

**Dated July 29, 2016**

 

James W. Boyd
United States Bankruptcy Judge